IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICTOR LOPEZ,<br><br>  Petitioner,<br><br> vs.<br><br>ROBERT AYERS, JR., Warden,<br><br>  Respondent. | No. C 08-05341 JW (PR)<br><br>ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY AS UNNECESSARY |

Petitioner, a California prisoner proceeding pro se, filed a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging a 2007 decision of the California Board of Parole Hearings ("Board") finding petitioner unsuitable for parole. The Court ordered respondent to show cause why the petition should not be granted. Respondent filed an answer, and petitioner filed a traverse.

**PROCEDURAL BACKGROUND**

In 1989, a Los Angeles County Superior Court jury convicted petitioner of kidnapping for robbery with a firearm enhancement, and possession of marijuana. Petitioner was sentenced to life plus one year in prison. On May 3, 2007, the Board denied petitioner eligibility for parole. Petitioner filed a habeas petition in the state

superior court, which denied the petition in a reasoned opinion on December 12, 2007. Thereafter, petitioner filed a petition in the California Court of Appeal and a petition for review with the California Supreme Court, both of which summarily denied review. Petitioner filed the instant federal petition on November 25, 2008.

## FACTUAL BACKGROUND

A. <u>The Commitment Offense</u>

The following summary of facts is taken from the opinion of the California Court of Appeal on direct appeal and read into the transcript of the Board hearing:

> The evidence established that at about 7:30 p.m. on June 15, 1987, Henry Grayson, Junior, a District Attorney investigator and principal bodyguard for Los Angeles County District Attorney Ira Reiner and his family, was sitting in a 1985 Buick owned by the County of Los Angeles, across the street from Spago's Restaurant as he waited for Reiner and his wife to finish dinner.
>
> The car had official "E" license plates, two blue lights on the rear, and two antennae on the trunk, one for a car telephone and one for a two-way radio. The doors were locked, but the front windows on both sides of the car were open. At the time, Grayson was armed with a .380 caliber automatic pistol that was loaded with approximately 13 rounds of hollow point, silver-tipped bullets.
>
> Sometime between 7:30 and 8 p.m., after he had used the car telephone, two Hispanic men, later identified as Jose Escarcega, and Arturo Samaniego, suddenly approached the car. Samaniego walked up to the window on the passenger side, pointed an automatic pistol at Grayson's head and told Grayson he was going to blow his head off. Grayson saw that Samaniego's finger was on the trigger, the safety was off, and Samaniego held the gun in a double-hand grip.
>
> Meanwhile, Escarcega went up to the driver's door, reached inside the open window and opened the door. Both men entered the car so that Grayson was sitting between them on the front seat. Grayson dropped the car keys on the floor, but Escarcega immediately retrieved them and reinserted them into the ignition.
>
> Escarcega then spoke in Spanish to Samaniego while he touched the car phone, two-way police radio, and a red spotlight located on the car's transmission hump. Samaniego responded to Escarcega in Spanish, while repeatedly threatening Grayson in English, that he was going to blow his brains out and ordering him not to move. The entire time he was pointing the gun at Grayson's head and ribs with his finger on the trigger.
>
> After Escarcega finished touching the various items in the car, he noticed Grayson's weapon and badge. Escarcega removed Grayson's

weapon and as he placed it under his leg, said, "policia." Escarcega started the car and drove towards Sunset Boulevard. As the car began to move, Grayson looked around and in the rear view mirror for anything "unusual" that would indicate someone saw what had happened to him.

As the car turned on to Sunset, in the rear view mirror, Grayson saw a red Mercedes directly behind the Buick. It was driven by a Latin male, later identified as [petitioner.] Its front license plate was not a legal California plate in that it was red, while, and blue with stars and had "USA" on it.

As they continued driving along Sunset, Grayson noted that the Mercedes was always directly behind the Buick in the same lane. After traveling for several blocks, Escarcega turned onto Hilldale and then made a sharp left onto Shoram, which was marked with a sign indicating that it was not a through street. The red Mercedes followed and was never farther than a car length from the Buick.

During the entire drive, Samaniego had the gun pointed at Grayson with his finger on the trigger. Escarcega parked the car near the intersection on the wrong side of the street next to some tall hedges, and the red Mercedes pulled up and parked behind the Buick. Samaniego immediately got out of the car and told Grayson to also get out because he was going to kill him now. Grayson got out of the car and stood next to the right front fender, facing towards the back of the car. Escarcega meanwhile stood between the car and the partially open driver's door.

[Petitioner,] Escarcega and Samaniego began conversing with each other in Spanish, while Samaniego held the gun pointed at Grayson's head. [Petitioner] remained in the Mercedes and during their conversation, which was conducted in a normal tone of voice, [petitioner] was "extremely calm" and appeared to "have almost a smirk on his face."

Grayson decided to try to escape and he noticed that Samaniego would occasionally direct his attention away from Grayson, and look over his shoulder at [petitioner.] As Samaniego turned his head, Grayson ran up Shoram in a zig-zag pattern. When he looked back, he saw Samaniego get into the Buick and the Buick drive away towards Sunset Boulevard. The Mercedes was directly behind the Buick.

As Grayson ran after the two cars, he flagged down a green van, identified himself as a police officer, and asked the driver of the van to follow the Buick. The driver agreed but when they reached Sunset, traffic was extremely heavy and they were unable to pursue the Buick. Grayson jumped out of the van when he saw the Buick clear the traffic signal, and almost ran into the Mercedes which was driving against traffic, almost on the wrong side of the street.

Grayson ran after the Mercedes and memorized the license number and also wrote it down, partially on a three-by-five card, and partially on his hand. The Mercedes accelerated and got away by cutting through traffic. Grayson ran into a shop and called 911. A patrol car arrived almost immediately.

(Pet., Ex. A, Transcript "Tr" at 25-29.)

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability as Unnecessary
P:\PRO-SE\SJ.JW\HC.08\Lopez05341_denyHC-parole.wpd

3

B.  Parole Suitability Hearing

Petitioner's minimum parole eligibility date was December 25, 1998. On May 3, 2007, petitioner appeared with counsel before the Board for a parole suitability hearing. The Board first recited petitioner's version of the underlying crime, in which petitioner states he and his co-defendants were drunk at the time and petitioner did not plan or intend to take Grayson as a hostage. (Tr. at 35.) The Board then looked at petitioner's prior criminal history and noted he had a 1984 juvenile arrest for possession of a controlled substance. (Id. at 39.) Petitioner then received a 1987 adult conviction for spousal abuse, for which he was sentenced to 45 days in jail and 18-months probation. (Id. at 40.) Then, three months later, petitioner was arrested for the instant offense. (Id. at 41.) Petitioner absconded while on bail and was arrested and convicted in Arizona in 1989 for assault with a deadly weapon. (Id. at 44.) Then petitioner again was arrested in 1991 in Merced for possession of marijuana for sale. (Id. at 41.)

The Board then looked at petitioner's personal history. Petitioner was 21 years old at the time of the underlying convictions. (Id. at 49.) Petitioner is the oldest of five children. (Id.) His mother brought he and his siblings to the United States from Mexico. (Id.) Petitioner began drinking alcohol when he was 14 or 15 years old. (Id. at 53.) Petitioner also used marijuana and cocaine, but mostly he preferred drinking beer. (Id. at 55.)

While in prison, petitioner has not gone to school, although he achieved his GED in 1985, and has not engaged in self-studies. (Id. at 58-59, 60.) Petitioner has worked in maintenance at the prison and has participated in Alcholics Anonymous and Narcotics Anonymous since 1995. (Id. at 59, 62.) Petitioner has received five disciplinary reports. (Id. at 60.) Petitioner received a 115 in 1995 for an administrative matter; in 1996 for trafficking narcotics; and in 1997 for engaging in mutual combat. (Id. at 61.) Petitioner also received two counseling chronos. The first in 1997 for failure to return medication and the last occurring in 2001 for failing to comply with giving saliva and blood. (Id.)

The Board reviewed petitioner's March 2007 psychiatric evaluation. (Id. at 62-

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability as Unnecessary
P:\PRO-SE\SJ.JW\HC.08\Lopez05341_denyHC-parole.wpd

4

67.) Petitioner's parole plans include being deported to Mexico because he has an INS hold. (Id. at 67.) The Board then reviewed support letters for petitioner's release. (Id. at 70-74.) The Board heard closing statements from the Attorney General's office against parole and from counsel for petitioner in favor of parole. The Board then took a recess before rendering its decision finding petitioner unsuitable for parole. (Id. at 106-117.)

## DISCUSSION

**A.   Standard of Review**

Because this case involves a federal habeas corpus challenge to a state parole eligibility decision, the applicable standard is contained in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). McQuillion v. Duncan, 306 F.3d 895, 901 (9th Cir. 2002). Under AEDPA, a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412 (2000). A federal court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1).

Where, as here, the highest state court to reach the merits issued a summary opinion which does not explain the rationale of its decision, federal court review under section 2254(d) is of the last state court opinion to reach the merits. Bains v. Cambra, 204 F.3d 964, 970-71, 973-78 (9th Cir. 2000). In this case, the last state court opinion to address the merits of petitioner's claim is the opinion of the Los Angeles County Superior Court.

**B.   Analysis of Legal Claims**

Petitioner claims that (1) the Board's decision violates due process because it was not supported by some evidence, (Pet. 9); (2) the Board used unconstitutionally vague

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability as Unnecessary
P:\PRO-SE\SJ.JW\HC.08\Lopez05341_denyHC-parole.wpd

5

terms when it found the commitment offense was "very cruel and callous," (id. at 15); (3) the Board violated due process when it failed to "balance the cruelty and callousness of the commitment offense against the passage of time and other factors," (id. at 12); (4) there is no nexus between the commitment offense and petitioner's present dangerousness; and (5) the Board's reasoning that the commitment offense was carried out in a way that "mental anguish was inflicted upon the victim" was unconstitutionally vague and violated due process, (id. at 32).

After further reflection, it appears that Claims 1, 3 and 4 can be subsumed into one claim, and Claims 2 and 5 can be subsumed into one claim. Thus the Court will address petitioner's claims as follows: (1) the Board's decision violates due process because it was not supported by some evidence and (2) the Board used unconstitutionally vague terms when it found the commitment offense was "very cruel and callous," and concluded that the commitment offense was carried out in a way that "mental anguish was inflicted upon the victim". Respondent argues that California inmates do not have a federally protected liberty interest in parole release.

### 1. Some Evidence

The Ninth Circuit has held that California prisoners have a constitutionally protected liberty interest in release on parole, and therefore they cannot be denied a parole date without adequate procedural protections necessary to satisfy due process. See Irons v. Carey, 505 F.3d 846, 850 (9th Cir. 2007). The Supreme Court has clearly established that a parole board's decision deprives a prisoner of due process if the board's decision is not supported by "some evidence in the record," or is "otherwise arbitrary." Sass v. California Bd. of Prison Terms, 461 F.3d 1123, 1129 (9th Cir. 2006) (adopting "some evidence" standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)). The "some evidence" standard identified in Hill is clearly established federal law in the parole context for AEDPA purposes. Sass, 461 F.3d at 1128-29. Additionally, the evidence underlying the board's decision must have some indicia of reliability. McQuillion, 306 F.3d at 904; Jancsek v. Oregon Bd. of

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability as Unnecessary
P:\PRO-SE\SJ.JW\HC.08\Lopez05341_denyHC-parole.wpd

6

Parole, 833 F.2d 1389, 1390 (9th Cir. 1987).  Accordingly, if the Board's determination of parole suitability is to satisfy due process, there must be some evidence, with some indicia of reliability, to support the decision.  Rosas v. Nielsen, 428 F.3d 1229, 1232 (9th Cir. 2005); McQuillion, 306 F.3d at 904.

Recently, the Ninth Circuit reheard en banc the panel decision in Hayward v. Marshall, 512 F.3d 536 (9th Cir. 2007), reh'g en banc granted, 527 F.3d 797 (9th Cir. 2008), which presented a state prisoner's due process habeas challenge to the denial of parole.  The panel had concluded that the gravity of the commitment offense had no predictive value regarding the petitioner's suitability for parole and held that because the Governor's reversal of parole was not supported by some evidence, it resulted in a due process violation.  512 F.3d at 546-47.  The Ninth Circuit has not yet issued an en banc decision in Hayward.  Unless or until the en banc court rules otherwise, the holdings in Biggs v. Terhune, 334 F.3d 910, 916 (9th Cir. 2003), Sass, and Irons are still the law in this circuit.

When assessing whether a state parole board's suitability determination was supported by "some evidence," the court's analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state.  Irons, 505 F.3d at 850.  Accordingly, in California, the court must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision constituted an unreasonable application of the "some evidence" principle.  Id.

California law provides that a parole date is to be granted unless it is determined "that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration . . . ."  Cal. Penal Code § 3041(b). The California Code of Regulations sets out the factors showing suitability or unsuitability for parole that the Board is required to consider.  See 15 Cal. Code Regs. tit. 15 § 2402(b).  These include "[a]ll relevant, reliable information available," such as:

> . . . the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in finding of unsuitability.

Id.

Circumstances tending to show unsuitability for parole include the nature of the commitment offense and whether "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner." Id. at § 2402(c). This includes consideration of whether "[t]he offense was carried out in a dispassionate and calculated manner," whether the victim was "abused, defiled or mutilated during or after the offense," whether "[t]he offense was carried out in a manner which demonstrated an exceptionally callous disregard for human suffering," and whether "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." Id. Other circumstances tending to show unsuitability for parole are a previous record of violence, an unstable social history, previous sadistic sexual offenses, a history of severe mental health problems related to the offense, and serious misconduct in prison or jail. Id.

Conversely, circumstances tending to support a finding of suitability for parole include: no juvenile record; a stable social history; signs of remorse; that the crime was committed as a result of significant stress in the prisoner's life; a lack of criminal history; a reduced possibility of recidivism due to the prisoner's present age; that the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release; and that the prisoner's institutional activities indicate an enhanced ability to function within the law upon release. See id. at § 2402(d).

In making its determination in this case, the Board analyzed numerous factors weighing for and against suitability for parole. The Board began by reviewing the commitment offense and determined that the offense was carried out in a cruel and

callous manner in a way that inflicted mental anguish upon his victim in that the victim was held at gunpoint while repeatedly being told that his "head was going to be blown off" and he would be killed. (Tr. at 106-107, 112.) The Board commented that the crime was carried out in a calculated manner in that petitioner and his co-defendants were looking for antennas on cars to steal a car phone. (Id. at 107.) The Board noted that the motive was trivial in relation to the crime because it was motivated by basic greed of obtaining a free phone. (Id.) The Board found that petitioner has a record of assaultive behavior and an escalating pattern of criminal conduct and it appeared that nothing would stop petitioner from committing crimes as he jumped bail after he was arrested for the kidnapping conviction and then was arrested again for a different crime. (Id. at 109-110.) The Board stated that petitioner has failed from previous grants of probation. (Id. at 110.) The Board observed that even after being institutionalized, petitioner was still involved in drugs. (Id. at 114.) The Board summarized his institutional behavior as not upgrading educationally and receiving at least three chronos for drug-related activity and mutual combat. (Id. at 110.) Finally, the Board noted that the psychological report indicated that petitioner had adult anti-social behavior and demonstrated a need for a longer period of observation and treatment. (Id. at 114.) The Board recommended additional programming and that petitioner gain some understanding and insight into himself and the life crime. (Id. at 114-115.) The Board concluded that the factors tending to show suitability were outweighed by factors showing unsuitability and denied parole.

The superior court rejected petitioner's habeas petition, finding that the Board's decision was supported by "some evidence." (Resp. Ex. 2.) Specifically, the court concurred with the Board's determination that petitioner's crime was committed in a dispassionate and calculated manner, that petitioner had a previous record of violence including the fact that he had absconded from arrest for the underlying kidnapping conviction and was arrested for a separate crime in the meantime, and petitioner received several 115s while incarcerated, including one for drug trafficking and another for

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability as Unnecessary
P:\PRO-SE\SJ.JW\HC.08\Lopez05341_denyHC-parole.wpd

9

mutual combat. (<u>Id.</u> at 2.)

This court also concludes that the Board reasonably found that the circumstances of the offense was carried out in a dispassionate and calculated manner. The victim was held at gunpoint for the entire duration of the crime and repeatedly threatened with death. Further, the motive was trivial as petitioner stated that they wanted to steal a phone because one of the co-defendants owed petitioner money. These facts alone amount to "some evidence" that petitioner would present an unreasonable threat to the public if released, but there was additional evidence in the record supporting the Board's parole denial as well. The Board also relied upon petitioner's prior criminal history, his institutional behavior, and his psychological report. Although petitioner had been participating in AA and NA since 1995, he received several 115s and an administrative chrono relating to either physical combat or drug trafficking. Petitioner asserted during the parole suitability hearing that the underlying crime and all previous crimes were committed while he was under the influence of substance abuse. In light of the petitioner's criminal history, such institutional infractions in 1996, 1997, and 2001 -- while petitioner is participating in AA and NA -- are causes for concern as to whether petitioner can abide by societal norms and refrain from being an unreasonable risk of danger to the community.

The record of the 2007 parole hearing demonstrates at least "some evidence" that petitioner would pose a risk of harm to society if released and that parole should be denied. <u>See</u> <u>Rosas</u>, 428 F.3d at 1232–33 (facts of the offense and psychiatric reports about the would-be parolee sufficient to support denial). The state court's rejection of petitioner's due process claim was neither contrary to nor an unreasonable application of the "some evidence" requirement of due process. Moreover, contrary to petitioner's assertion, the concern expressed in <u>Biggs</u> is not triggered here because the Board did not deny parole solely because of the unchanging factor of the nature of petitioner's offense. <u>Cf.</u> <u>Rosas</u>, 428 F.3d at 1232-33. Therefore, the state court's rejection of petitioner's due process claim was not contrary to or an unreasonable application of the "some evidence"

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability as Unnecessary
P:\PRO-SE\SJ.JW\HC.08\Lopez05341_denyHC-parole.wpd

10

standard.

### 2. Vagueness

Petitioner contends that the Board's description of the commitment offense as "very cruel and callous" and carried out in a way that "mental anguish was inflicted upon the victim" is unconstitutionally vague. 15 Cal. Code Regs. § 2402(c)(1). In essence, petitioner argues that the criteria of § 2402 is unconstitutionally vague. (Pet. at 11.)

Vagueness challenges made under the Due Process Clause "rest on the lack of notice." Maynard v. Cartwright, 486 U.S. 356, 361 (1988). A statute or regulation is unconstitutionally vague "if it fails to give adequate notice to people of ordinary intelligence concerning the conduct it proscribes, or if it invites arbitrary and discriminatory enforcement." United States v. Doremus, 888 F.2d 630, 634 (9th Cir. 1989). Vagueness challenges to statutes or regulations that do not threaten First Amendment rights, such as this one, are analyzed on an as-applied basis. Maynard, 486 U.S. at 361. To avoid unconstitutional vagueness, a statute or ordinance must (1) define the offense with sufficient definiteness that ordinary people can understand what conduct is prohibited; and (2) establish standards to permit police to enforce the law in a non-arbitrary, non-discriminatory manner. Vlasak v. Superior Court of California, 329 F.3d 683, 688-89 (9th Cir .2003). In a vagueness challenge, the federal court must look to the plain language of the statute, as well as construe the statute as it has been interpreted by the state courts. Nunez v. City of San Diego, 114 F.3d 935, 941-42 (9th Cir. 1997). Thus, the question here is whether Section 2402(c)(1) provided petitioner with adequate notice and the state court with adequate guidance.

The phrases "very cruel and callous" and "mental anguish" are not only absent from the statutory language but merely descriptions used by the Board to depict the seriousness of petitioner's crime. Further, those phrases are no more vague than "the utmost disregard for human life, i.e., the cold-blooded pitiless slayer," which has been held sufficiently determinate for death penalty use. See Arave v. Creech, 507 U.S. 463, 470-78 (1993) (Idaho death penalty statute citing as an aggravating factor crimes carried

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability as Unnecessary
P:\PRO-SE\SJ.JW\HC.08\Lopez05341_denyHC-parole.wpd

11

out in an "utter disregard for human life" was not impermissibly vague because limiting construction had been adopted which defined factor as those crimes demonstrating "the utmost disregard for human life, i.e., the cold-blooded pitiless slayer"). Given that "[t]he Due Process Clause does not require the same precision in the drafting of parole release statutes as is required in the drafting of penal laws," Hess v. Board of Parole and Post-Prison Supervision, 514 F.3d 909, 913-14 (9th Cir. 2008), and a phrase no less vague was been upheld by Arave in the penal law context, it is clear that this claim is without merit. See, e.g., Edwards v. Curry, 2009 WL 1883739, * 9 (N.D. Cal. 2009) (unpublished) ("because these sub-factors [which include 'exceptionally callous disregard for human suffering'] are set forth in simple plain words, such that a reasonable person of ordinary intelligence would understand their meaning and the conduct they proscribe, the notice requirement is satisfied."); Wagoner v. Sisto, 2009 WL 2712051, *6 (C.D. Cal. 2009) (unpublished) (stating "the five sub-factors outlined in § 2402(c)(1)(A)-(E) serve to limit the 'heinous, atrocious or cruel' language of section 2402(c) and narrow the class of inmates that are found unsuitable for parole . . . thus, the terms are not unconstitutionally vague"); Burnright v. Carey, 2009 WL 2171079, *5 (E.D. Cal. 2009) (unpublished) (finding that after reading Cal. Penal Code § 3041(b) together with 15 C.C.R. §§ 2402(c) and (d), a reasonable person of ordinary intelligence would understand, and therefore be on notice, regarding the standards for parole eligibility).

Thus, the state court's rejection of petitioner's void for vagueness claim was not contrary to or an unreasonable application of clearly established federal law.

## CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners have recently been amended to require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling. See Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009).

1  However, the Ninth Circuit has made clear that a state prisoner challenging the Board of
2  Prison Terms' administrative decision to deny a request for parole need not obtain a
3  certificate of appealability.  See <u>Rosas</u>, 428 F.3d at 1232.  Accordingly, any request for a
4  COA is DENIED as unnecessary.

## CONCLUSION

For the reasons set forth above, the petition for a writ of habeas corpus is DENIED on the merits and a COA is DENIED as unnecessary.

DATED: April 13, 2010

*James Ware*
JAMES WARE
United States District Judge

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability as Unnecessary
P:\PRO-SE\SJ.JW\HC.08\Lopez05341_denyHC-parole.wpd

13

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

VICTOR LOPEZ,

        Petitioner,

  v.

ROBERT AYERS JR, Warden,

        Respondent.
                                      /

Case Number: CV08-05341 JW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on 4/14/2010, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Victor Lopez H-70404
San Quentin State Prison
San Quentin, Ca 94974

Dated: 4/14/2010

                                            Richard W. Wieking, Clerk
                                        /s/ By: Elizabeth Garcia, Deputy Clerk

Victor Lopez H-70404
San Quentin State Prison
San Quentin, Ca 94974


CV08-05341 JW